IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING A DOCUMENTARY SEARCH WARRANT FOR THE PROPERTIES LOCATED AT: | ) ) ) ) ) | MISC NO. |
| **78 Ashley Hall Plantation Road, Apartment D 8, Charleston, SC 2003 Chevy Tahoe 9917KK Registered to Matthew Carlos James** | ) ) ) ) ) | **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANT**

I, ROD RAPE, a Special Agent with the DEA Task Force, being duly sworn, declare and state:

1.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since May of 1996. I, Rod Rape, have been a law enforcement officer since February of 1993. Before becoming a Special Agent with the DEA, I was a police officer in Tuscaloosa, AL (Tuscaloosa Police Department) from 1993 to 1995 and a police officer with the Rockville, MD City Police Department. While working as a special agent with the DEA I have primarily conducted investigations involving the illegal importation and distribution of drugs, and weapon and money laundering violations and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of recorded conversations, and have conducted or participated in investigations that included the interception of electronic communications.

1

2.      Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the terminology and coded language used by drug traffickers.

3.      While involved in investigations involving drug trafficking and criminal enterprises, I have communicated extensively with other federal, state, and local law enforcement personnel who specialize or have expertise in this area. Based on my training, experience, and participation in drug trafficking investigations, I know that:

a)      Drug traffickers must maintain at ready access large amounts of cash in order to maintain and finance their ongoing drug business;

b)      Because drug trafficking on the scale revealed in this investigation is frequently a continuing activity which spans many years, because the traffickers inventory of controlled substances fluctuates depending on availability and demand, and because drug traffickers commonly front drugs, or provide them on consignment to their customers, the traffickers must maintain books, receipts, notes, ledgers or some other type of record reflecting such transactions. Drug traffickers and members of criminal enterprises must keep their records in some secure, yet readily accessible, place where they can be used and maintained, such as in homes, offices, places of business, automobiles, safes or safe deposit boxes. Drug traffickers and members of criminal enterprises must keep these records of their illegal activities beyond the time during which controlled substances are actually in their possession, so that they can maintain contact with their criminal associates for future drug transactions, and so that they can keep records of prior transactions for which they might be owed or owe inventory or money;

2

c)    Drug traffickers and members of criminal enterprises commonly hide controlled substances, drug proceeds, and records of their drug transactions in secure locations, as well as in offices or places of business, garages, or storage buildings. Similarly, the traffickers and members of criminal enterprises have ready access to these items, and attempt to conceal them from law enforcement agencies;

d)    Drug traffickers and members of criminal enterprises often conceal controlled substances, currency, financial instruments, documents relating to financial transactions, precious metals, jewelry, other items of value, and proceeds of drug transactions, all of which constitutes evidence of drug trafficking activities. Additionally, such items constitute evidence of transactions establishing the generation, transfer, concealment, and expenditure of large sums of money made from trafficking in controlled substances. Drug traffickers maintain these items in secure, yet convenient locations, such as their homes, offices, and places of business, garages, storage buildings, automobiles, and safe deposit boxes;

e)    Drug traffickers and members of criminal enterprises commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and telephone numbers for their drug trafficking and money laundering associates. These items are sometimes in code;

f)    Drug traffickers and members of criminal enterprises frequently have photographs and video of themselves, their associates, their property, firearms, and controlled substances, which are usually maintained in their homes, offices and place of business. Such photographs and videos constitute evidence of their drug trafficking and criminal activities, establishing their connections with items of

3

property with each other, and with drugs and firearms;

g)      Drug traffickers and members of criminal enterprises involved in importation or transportation of controlled substances from source cities generally possess documentation, such as telephone records, correspondence, shipping receipts, wire transfers, airline ticket receipts, and the like, which pertain to the acquisition, transportation, shipment, or receipt of, or payment for, controlled substances, which is evidence of the traffickers' participation in the illegal drug scheme;

h)      Drug traffickers and members of criminal enterprises often maintain some record of the movement of money, whether it is accomplished by wire or interbank transfer or by a person acting as a courier. Such records, even though they may be in code, are evidence of the traffickers and/or the criminal enterprise member's illegal activities;

i)      Drug traffickers and members of criminal enterprises often use false or fictitious names or corporations or other business entities to launder their drug proceeds and to send shipments of cash or controlled substances through the mail or other delivery services. Banks, both domestic and abroad, are sometimes utilized by traffickers or their agents though which proceeds from their illegal activities are laundered. Funds are frequently transferred between banks and various accounts to conceal their sources and origins. It is also common to obtain bearer or other negotiable instruments through foreign banks to avoid the necessity of filing currency transaction reports, in this manner concealing the fact of the transaction and the true ownership of the funds. Documents or records of any kind reflecting any connection with any such entity or transaction constitute evidence

4

of the traffickers participation in the illegal scheme;

j)      Drug traffickers and members of criminal enterprises frequently utilize a continuing pattern of activities to launder and conceal drug-generated proceeds and assets, which lasts over a period of years. Drug traffickers use these patterns or schemes to create the appearance of legitimate income so that they can eventually convert the proceeds or assets to themselves or to a nominee under their control. In this way, the traffickers and members of criminal enterprises can enjoy and use their properties while attempting to conceal their illegal activities, which generated the proceeds or assets;

k)      Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, which includes trafficking in controlled substances and illegal schemes to conceal drug-generated proceeds;

l)      Drug traffickers and members of criminal enterprises who deal in illegal controlled substances often use cellular telephones to maintain contact with and receive phone and or text messages from their customers, suppliers, and co-conspirators to further their drug distribution activity;

m)      Drug traffickers and members of criminal enterprises often possess and maintain firearms, ammunition and bulletproof vests in their homes to protect their drugs and illegal proceeds. The firearms and ammunition are used in violation of Title 18, United States Code, Section 924(c) and are considered tools of the drug trade; and

n)      In addition, during the course of such residential searches, I have also found items of personal property and or mail that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises

o)      Additionally, I believe that drug traffickers utilize vehicles to transport drugs and drug proceeds and to store instrumentalities of their drug trafficking.

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

3.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was either obtained by me personally or provided by a law enforcement officer, who may have had either direct or hearsay knowledge of the statement, to whom I have spoken, or whose report(s) I have reviewed. Similarly, except where otherwise indicated, information resulting from surveillance does not always set forth my personal observations, but rather those observations provided directly or indirectly by, and/or through other special agents and task force officers of DEA or other law enforcement officers who conducted such surveillance. Because this affidavit is submitted for the limited purpose of showing probable cause, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that the facts provided establish probable cause.

## PURPOSE OF AFFIDAVIT

4.      This Affidavit is being submitted in support of an Application by the United States of America, which seeks search warrants for the following residences described in Attachment A:

**78 Ashley Hall Plantation, Apartment D 8, Charleston, SC**

AND

**2003 Chevy Tahoe 9917KK Registered to Matthew Carlos James**

## THE DRUG TRAFFICKING ORGANIZATION

5.      Since September 2016, the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), United States Postal Inspection Service (USPIS), the Charleston

6

County Sheriff's Office (CCSO), North Charleston Police Department and the Beaufort County Sheriff's Office (BCSO) have been involved in the investigation of a drug trafficking organization (DTO) operating in the low country of South Carolina. Based on investigative efforts including statements from confidential sources (CSs), cooperating defendants (CDs), and the interception of TARGET TELEPHONE 3 used by Carlton EDWARDS, the interception of TARGET TELEPHONE 4 used by Keith CHISHOLM, the interception of TARGET TELEPHONE 11 used by Michael HUBBART as well as the interception of a telephone used by David ECCLESTON, I have learned that Carlton EDWARDS receives cocaine and marijuana from David ECCLESTON, a/k/a "the General," and Diane ELLIS and others unknown and utilizes Wayland PARKER and Michael HUBBART to receive the drug laden parcels through their employment with the United States Postal Service (USPS) and FedEx. Michael HUBBART, Matthew JAMES, Joe JEFFERSON, Brandon GLOVER, Diamond FLOYD and others then distribute the drugs in South Carolina.

## TITLE III INVESTIGATION

6.    On October 12, 2018, the Honorable Judge Margaret B. Seymour, United States District Judge, District of South Carolina, authorized the interception of wire and electronic communications occurring over telephone number 843-974-7533 (TARGET TELEPHONE 2) and telephone number 347-984-4754 (TARGET TELEPHONE 3), both used by EDWARDS. Monitoring was initiated on October 12, 2018, and was terminated on October 23, 2018. During the intercepted communications, EDWARDS was actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON and others.

7.    On January 10, 2019, the Honorable Dale S. Fisher, United States District Judge, Central District of California, authorized the interception of wire and electronic communications occurring over telephone number 562-479-4890, used by ECCLESTON. Monitoring was initiated

on January 14, 2019, and was terminated on February 12, 2019. During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON and other.

8.    On February 13, 2019, the Honorable Dale S. Fisher, United States District Judge, Central District of California, authorized the continued interception of wire and electronic communications occurring over telephone number 562-479-4890, used by ECCLESTON. Monitoring was initiated on February 13, 2019, and was terminated on March 14, 2019. During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON and others.

9.    On June 4, 2019, the Honorable Margaret B. Seymour, United States District Judge, District of South Carolina, authorized the interception of wire and electronic communications occurring over telephone number 843-300-8851 (TARGET TELEPHONE 11), used by Michael HUBBART.  Monitoring was initiated on June 5, 2019 and was terminated on July 4, 2019. During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON and others.

### LOCATIONS TO BE SEARCHED

**78 Ashley Hall Plantation, Apartment D 8, Charleston, SC**

**2003 Chevy Tahoe 9917KK Registered to Matthew Carlos James**

10.    **78 Ashley Hall Plantation, Apartment D 8, Charleston, SC** is an apartment of Matthew JAMES aka "Family" as a place of drug distribution located in the Ashley Oaks apartments.

11.    **2003 Chevy Tahoe 9917KK Registered to Matthew Carlos James** is the vehicle of JAMES, a/k/a "Family," used for drug trafficking.

## PROBABLE CAUSE

12.    On January 22, 2019, at approximately 7:35 a.m., ECCLESTON using telephone number 562-479-4890, received an incoming call from telephone number 843-751-0583, a telephone used by EDWARDS. During the intercepted conversation, ECCLESTON told EDWARDS to send him "4 things" because ECCLESTON "has 10 right here." EDWARDS explained that he owed an unidentified man in Florida and that he would put himself last. EDWARDS stated that once he sorted out things with the man in Florida, then he would give "Joe (JEFFERSON) and then give 'Family' (JAMES) his thing." EDWARDS asked ECCLESTON if it was 3 different places, and ECCLESTON explained that "it would be 4 because they would do 3, 3, 2, 2." EDWARDS acknowledged and told ECCLESTON to send "3 to 'Family'" because "Family" owes EDWARDS money. ECCLESTON agreed and directed EDWARDS to tell "Family" to "send the thing." Based on the intercepted communication, my experience in this case and my training, I believe ECCLESTON's request for "4 things" was a request four addresses to ship four parcels containing drugs.

13.    On February 25, 2019, at approximately 7:21 a.m., ECCLESTON, using telephone number 562-479-4890 received two incoming text messages from telephone number 786-860-1185, TARGET TELEPHONE 13, used by Matthew JAMES a/k/a "Family." The first text message listed the following address:

Mya White

9

4209 Kelly Street, Unit A
North Charleston, SC 29405

The second incoming text message ECCLESTON received from telephone number 786-860-1185, TARGET TELEPHONE 13 used by JAMES, a/k/a "Family" read:

"Fam."

14.    Based on the intercepted communication, my experience in this case and my training, I believe that JAMES a/k/a "Family" had communicated with EDWARDS who instructed JAMES a/k/a "Family" to provide ECCLESTON with an address to ship a drug-laden parcel to JAMES a/k/a "Family" provided the Kelly Street address as well as a follow up text message identifying himself as "Fam" (Family).

Following these 2 incoming text messages from JAMES a/k/a "Family," on February 25, 2019, at approximately 7:22 a.m., ECCLESTON, using telephone number 562-479-4890 made an outgoing call to telephone number 786-860-1185, TARGET TELEPHONE 13, used by JAMES a/k/a "Family." During the intercepted conversation, ECCLESTON identified the user of telephone number 786-860-1185, TARGET TELEPHONE 13 as "Family." ECCLESTON then confirmed receipt of the address and explained that he would "jump on it today." Based on the intercepted communication, my experience in this case and my training, I believe that ECCLESTON was confirming that the shipment of drugs to JAMES a/k/a "Family" was being prepared immediately.

17.    On February 25, 2019, investigators confirmed that all four addresses provided by HUBBART, JEFFERSON and JAMES, a/k/a "Family" exist, however the Applied Science business, listed on Parcel 4, was a vacant building that had previously been occupied by the company. Furthermore, Limehouse Produce Company, listed on Parcel # 3, and AT&T Southeast, listed on Parcel # 2, are located adjacent to each other even though they are listed on

10

separate streets. The Kelly Street address, listed on Parcel # 1, is located on a dead end street. All four addresses are located on a FedEx delivery route that HUBBART frequently travels during his normal course of business.

18.     Later in the morning on February 25, 2019, agents established surveillance and at approximately 11:50 a.m. identified a Silver Nissan Maxima registered to Delroy ELLIS parked at JNC Shipping and Wireless located at 8013 Archibald Avenue in Rancho Cucamonga, CA. A subject believed to be ELLIS was observed leaving JNC Shipping and Wireless with what investigators identified as multiple, pre-printed shipping labels. ELLIS then traveled to a commercial business park where he entered an unmarked commercial unit within the business park. After some time inside, ELLIS was observed departing the unmarked commercial unit with 2 parcels, which he placed, into his vehicle before returning inside and exiting with 2 more parcels that he also placed into his vehicle. ELLIS was then observed as he traveled to a FedEx shipping center located at 11334 E. 4th Street, Suite 102 in Rancho Cucamonga, CA and dropped off 2 of the parcels before he travelled to a second FedEx shipping center located at 3371 E. Francis Street in Ontario, CA and dropped off 2 additional parcels. Investigators were able to visually observe 2 of the parcels dropped off by ELLIS that displayed the following shipping information:

4620 3515 6420                          4620 3515 6453

Mya White                               Stephanie Clancy
4209 Kelly Street, Unit A               Applied Science
North Charleston, SC 29405              1890 Milford St
                                        N. Charleston, SC 29405

19.     Following the surveillance, ECCLESTON, using telephone number 562-479-4890 attempted to contact telephone number 786-860-1185, TARGET TELEPHONE 13, used by JAMES a/k/a "Family", but was unsuccessful. JAMES a/k/a "Family" returned ECCLESTON'S

11

calls, and ECCLESTON stated that he had sent something and asked if JAMES a/k/a "Family" saw it. JAMES a/k/a "Family" replied that he had been riding his motorcycle and had not but that he would check it. The call ended, and moments later, JAMES a/k/a "Family" called ECCLESTON back and confirmed that he had received what ECCLESTON had sent.

20.    ECCLESTON, using telephone number 562-479-4890 was then contacted by HUBBART from telephone number 843-300-8851, TARGET TELEPHONE 11. ECCLESTON answered, "Yes sir?" HUBBART replied, "Hey, what's up General?" ECCLESTON asked, "How you doing." HUBBART stated, "I'm alright." ECCLESTON stated, "Um, I send three things to you. Did you see that?" HUBBART replied, "Yeah, I got 'em." ECCLESTON stated "Alright. Look, check them and make sure they are ok. Ok?" HUBBART agreed, "I got 'ya." A short time later, HUBBART, using TARGET TELEPHONE 11, responded to ECCLESTON with a text message that read, "Yeah they good to go." ECCLESTON then responded by sending HUBBART to telephone number 843-300-8851, TARGET TELEPHONE 11, a text message that read, "Kool." Based on the intercepted communication, my experience in this case and my training as well as the intercepted communications that followed and are detailed below, I believe that ECCLESTON was informing HUBBART that he had sent 3 drug laden parcels to the 3 addresses that HUBBART had previously provided ECCLESTON. I believe that those 3 parcels were later identified as Parcel #1, #2 and #3.

21.    Based on the intercepted conversations, agents located the 4 parcels and intercepted the parcels at the FedEx sorting facility located in Memphis, Tennessee on February 26 and 27, 2019. The information listed on the 4 parcels follows:

**PARCEL # 1**

Tracking #: 4620 3513 6420

From:  Shipping Department

JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730


To:    Mya White
       4209 Kelly Street, Unit A
       North Charleston, SC 29405


## PARCEL # 2

Tracking #: 4620 3513 6431

From:  Shipping Department
JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730


To:    Nelson Ramone
       AT&T Southwest
       2600 Meeting Street Rd
       North Charleston, SC 29405


## PARCEL # 3

Tracking #: 4620 3513 6442

From:  Shipping Department
JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730


To:    Matthew Fraiser
       Limehouse Produce Company
       2660 Carner Ave
       North Charleston, SC 29405


## PARCEL # 4

Tracking #: 4620 3513 6453

From:  Shipping Department

13

JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730

To:    Stephany Clancy
       Applied Science
       1890 Milford St
       North Charleston, SC 29405

22.    The 4 parcels remained unopened and were secured for shipment to Charleston,

SC. The tracking information in the FedEx system available to the public was updated by FedEx

to reflect that the 4 parcels had arrived at the FedEx Memphis sorting facility and no delivery

information was available. However, the internal FedEx system reflected that the 4 parcels were

held by security in Memphis, Tennessee for violation of FedEx shipping policy.

23.    On February 26, 2019, EDWARDS called ECCLESTON on telephone number

562-479- 4890. During the intercepted conversation, EDWARDS told ECCLESTON that the

"X-man," referring to HUBBART, had said that the "boogie man held the things from that side

of the road." Based on the intercepted communication, my experience in this case and my

training, I believe that HUBBART contacted EDWARDS and informed him that the 4 parcels

had been intercepted by law enforcement, which I believe he referred to as the "boogie man."

EDWARDS then contacted ECCLESTON and advised him the same.

24.    A short time later on February 26, 2019, ECCLESTON, using telephone number

562-479-4890 called EDWARDS and said that he had seen it that morning and saw that it was in

"Mem." ECCLESTON then explained that, "he said that was where they held onto it."

ECCLESTON then explained to EDWARDS that, "he can see more" than ECCLESTON. Based

on the intercepted communication, my experience in this case and my training, I believe that

ECCLESTON was tracking the 4 parcels and was aware that the 4 parcels had arrived in

14

Memphis, Tennessee but that HUBBART has access to internal FedEx systems that indicated that the 4 parcels had been seized.

25.    Later in the day, ECCLESTON and EDWARDS communicated again and included Diane ELLIS in the conversation. EDWARDS and ELLIS referred to ECCLESTON as "the General" and explained that they had also sent 4 parcels from California that contained "pop." Based on previous intercepted communications of TARGET TELEPHONE 3, my experience in this case and my training, I believe "pop" and "popcorn" are code for high-grade marijuana. EDWARDS detailed that he had sent 2 to "Family" and 2 to "X-Man" and confirmed that everything with those 4 parcels was good and the he had confirmed with Matthew JAMES a/k/a "Family" and HUBBART. EDWARDS told ECCLESTON that he spoke to HUBBART about what happened to the parcels sent by ECCLESTON, and HUBBART explained that, "the things were up the road but something did not sound right." EDWARDS said that he instructed HUBBART to "get to" his (HUBBART's) "source" and HUBBART did, to which EDWARDS told ECCLESTON that HUBBART can "see things that they cannot see." EDWARDS described that HUBBART told him "the lady told him (HUBBART) that the security took them off of the thing and placed them to the side." EDWARDS explained that he told HUBBART to leave the parcels alone and to watch what happens. EDWARDS said he told HUBBART that the greatest thing was that "no one was in trouble" and "no one was going to anybody" and the one person that was in trouble was "Family" because his ("Family") was a "straight thing" so "they[1] can go and talk to people." ECCLESTON acknowledged, and EDWARDS stated "with the other 3 they cannot go and talk to anyone." The two continued detailed conversation about the movement of the 4 parcels and the seizure by law enforcement. At the end of the intercepted conversation,

---

1 I believe EDWARDS was referring to law enforcement.

15

EDWARDS instructed ECCLESTON to send the tracking information to Diane ELLIS and she would do additional research.

26.    On February 26, 2019, HUBBART, using telephone number 843-300-8851, TARGET TELEPHONE 11, sent the following image to ECCLESTON, using telephone number 562-479-7890:



Based on the intercepted communication and information from investigators that perform parcel interdiction at the FedEx facility in North Charleston, SC, I believe that HUBBART was utilizing another FedEx employee to gain information about the 3 drug laden parcels sent by ECCLESTON. The image sent by HUBBART is a photograph of a computer screen identified at the North Charleston, SC FedEx facility and the information was obtained through a proprietary site used by FedEx and not available to the public. Based on this intercepted communication and

16

later communications detailed below that occurred between ECCLESTON and EDWARDS as well as ECCLESTON and ELLIS, I believe that HUBBART was informing ECCLESTON that the parcels had been seized by law enforcement at the Memphis, TN FedEx facility.

27.   On February 27, 2019, ECCLESTON using telephone number 562-479-4890, sent the following image to Diane ELLIS at telephone number 516-416-0628:



The label is the same as the label on Parcels # 1 intercepted at the FedEx sorting facility in Memphis, Tennessee.

28.   On February 28, 2019, Parcels # 1, # 2, # 3, and # 4 arrived in Charleston, South Carolina. Investigators set Parcel # 1 in a conference room along with multiple other parcels known not to contain narcotics. CCSO certified K9 handler Detective J. White introduced CCSO K9 Bostic to the conference room, and K9 Bostic alerted to the presence of narcotics odor within Parcel #1. CCSO K9 Bostic did not alert on any other parcels in the room. This process was repeated for Parcels # 2, # 3, and # 4 except during each search, the different parcels were placed in a different area of the room to avoid contamination. K9 Bostic also alerted to the presence of narcotics odor within Parcels # 2, # 3, and # 4.

17

29.     Later on the evening of February 28, 2019, CCSO Detective White visited the FedEx distribution center located in North Charleston, South Carolina. This is the facility that HUBBART reports to and operates from. Detective White observed a workstation within the facility that had the same post it note on the bottom right of an HP computer monitor that was pictured in the image sent to ECCLESTON from HUBBART using TARGET TELEPHONE 11.

30.     On March 1, 2019, search warrants were issued in United States District Court, District of South Carolina for Parcel # 1, # 2, # 3 and # 4. Upon executing the search warrants, agents discovered each parcel contained a box built of "luan" plywood. Agents opened the plywood box and found packing peanuts and bricks of cocaine taped together with brown packing tape. Parcel # 1 contained 2 kilograms of cocaine while Parcel # 2, # 3 and # 4 each contained 3 kilograms of cocaine. Each of the 11 kilograms of cocaine seized was identically wrapped / packaged and each had the same mustang horse imprinted on the kilograms.

33.     On June 7, 2019 at approximately 12:07 p.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from 928-529-9844, a telephone used by Carlton EDWARDS. The following is a transcript of the intercepted conversation:

EDWARDS: I'm on "Family" side, outside the garage where (U/I) "Family." So anytime you want you can swing by.

HUBBART: You say you over there now?

EDWARDS: Yeah sure.

HUBBART: Alright, I'll make my way over there now.

EDWARDS: Alright, I'm at the garage. I'm at the garage across the street. That's the mini mart right now, we're not in the hole, we are across the garage. So we're gonna go over there back that hole. Ok?

HUBBART: I got you.

EDWARDS: Alright.

18

HUBBART: Alright.

Based on the intercepted communication, I believe that EDWARDS is referencing a automobile repair garage operated by JAMES' relatives that is located across Rivers Ave from Kelly Street, North Charleston, SC. During this investigation, investigators have observed JAMES visit the garage on Macon Street on the opposite side of Rivers Avenue from Kelly Street prior to visiting 4209 Kelly Street, Unit A, North Charleston, SC.

34. On June 28, 2019, calls were intercepted between HUBBART and JAMES discussing a package was designated for HUBBART's route. Communications revealed that the package had been incorrectly placed on a different truck than HUBBART's and HUBBART had been unable to retrieve the package before it was delivered to its listed address. HUBBART requested that JAMES travel to the listed address to retrieve the package. Surveillance observed JAMES at the listed address in his **Tahoe**. Another individual came out of the apartment where the package had been delivered. Surveillance observed JAMES leave the address. Based on my training and experience, I believe the package contained narcotics and JAMES was attempting to retrieve the narcotics.

35. On July 3, 2019, EDWARDS was intercepted on a call with HUBBART. EDWARDS asked HUBBART if "Family" had paid for two boxes. EDWARDS said, "I'm gonna call Family, go and line up the boy, and I'm gonna call Family, in about an hour in between that mean so we can tell him that the boy go up the road and come back down." Later that day, HUBBART and EDWARDS spoke again, and EDWARDS asked "Whatcha gonna give to the Family right?" Later in the call EDWARDS stated, "Look here, do thinks different, so he don't know that nothing come from the General. . . Just take it to him and mark up the shit from him. Mark up different shit, get the crayon and mark it." Later that day, EDWARDS and HUBBART

19

communicated again, and EDWARDS stated, "Here is what he told though, listen. I told that man want 34, but the man give 33 right?" HUBBART responded, "Right, right." EDWARDS said, "So here what happen now. I say I send somebody drive gone up there for the thing, he gonna come back in half an  hour. He said alright. U/I I call it, he him tell me now man I Just want to cash talk for 32 man and I don't have nowhere to keep nothing. So I was like why you like me go up there for it." Later that day, surveillance observed HUBBART enter the Pine Point Plaza. JAMES's **Tahoe** was observed outside.

34. On July 10, 2019, surveillance was conducted on JAMES. JAMES's **Tahoe** was located at the Ashley Oaks apartment, in front of **78 Ashley Hall Plantation Road, Apartment D 8, Charleston, SC**.



## CONCLUSION

44.    I believe that JAMES, a/k/a "Family," is a drug traffickers and utilizes **78 Ashley Hall Plantation, Apartment D 8, Charleston, SC**, and his **2003 Chevy Tahoe 9917KK** for drug trafficking. I believe that JAMES resides at the apartment some of the time. I believe that drug traffickers keep drugs, drug scales, ledgers, receipts, and drug proceeds at their respective residences/businesses along with the items described in Attachment B and actively use their residences/businesses as a place to conduct drug transactions or to store drugs and or firearms. Based on the information provided above, I have reason to believe that JAMES a/k/a "Family," has used, and continue to use, the above listed address and vehicle to commit violations of federal laws, specifically Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 846. These violations include the unlawful possession of, possession with intent to distribute, the distribution of controlled substances, and conspiracies and attempts to do the same, in violation of Title 21, United States Code, Section 841(a)(1) and Title 21 United States Code 846. I believe those items listed in Attachment B, to include drug ledgers, cellular phones, phone records, and records pertaining to this conspiracy, and/or U.S. currency will be located at **78 Ashley Hall Plantation Road, Apartment D 8, Charleston, SC** and **2003 Chevy Tahoe 9917KK** and described in Attachment A.

21

AUSA Jamie Schoen has reviewed this Affidavit.

Respectfully submitted,

Rod Rape
DEA Special Agent

Subscribed and sworn to before me on July 25, 2019

BRISTOW MARCHANT
UNITED STATES MAGISTRATE JUDGE

22